**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **MARILYN FREITAG, an individual,** | ) | |
| **SHAWN P. JOHNSON, an individual,** | ) | |
| **ROBERT C. LAHMEYER, an individual,** | ) | |
| **KEVIN MEDLIN, an individual,** | ) | |
| **DAVID E. PANNEBAKER, JR., an individual,** | ) | |
| **and GLEN RILEY, an individual,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 04-CV-164-JHP-FHM** |
| | ) | |
| **SONIC AUTOMOTIVE, INC.,** | ) | |
| **a Delaware corporation, d/b/a** | ) | |
| **RIVERSIDE TOYOTA,** | ) | |
| **an Oklahoma corporation,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**ORDER and OPINION**

Before the Court is Defendant Sonic Automotive, Inc.'s Motion for Summary Judgment.

Defendant argues that it is entitled to summary judgment on all of Plaintiffs' claims, including

(1) violation of the Age Discrimination in Employment Act, (2) unlawful termination in

violation of Oklahoma public policy, (3) violation of the Americans with Disabilities Act, (4)

violation of the Oklahoma Anti-Discrimination Act, and (5) breach of contract.  Upon careful

consideration of Defendant's Motion, and for reasons stated herein, Defendant's Motion is

GRANTED in its entirety.

**Background**

Plaintiffs were employees of Crow Brothers' Toyota dealership.  In 2002, Crow Brothers

entered negotiations with Sonic Automotive, Inc. (SAI) for SAI to purchase the dealership. In

June 2002, Bob Hurley of SAI held a meeting for all Crow Brothers employees to announce the

1

sale.  SAI also held a meeting about health insurance for the Crow Brothers employees, and assumed responsibility for their COBRA coverage. Plaintiffs participated in these group meetings, and filled out paperwork for COBRA.  They allege that representatives of SAI assured them that their jobs were secure. Yet, on September 19, 2002, when the asset purchase agreement (APA) was executed and SAI took over from Crow Brothers, Plaintiffs were not retained as employees of the new entity, Riverside Toyota.

At the time the corporate entities executed the APA to create Riverside Toyota, Bob Hurley of SAI noted that Crow Brothers had good parts and service departments, but was not doing well in finance or used cars or physical maintenance of the facility.  SAI hired a new general manager who implemented new procedures following the close of the APA.  The new general manager, Paul Snedic, decided which Crow Brothers' employees to retain as employees of the new entity.  For example, Snedic hired Crow Brothers' employees as parts manager and service manager, but did not retain any of the sales managers.  Snedic also hired a new comptroller, Debbie Stuart, who made the decisions regarding who would work in the office. Crow Brothers' employees who were not hired as employees of the new entity were informed of the decision by Marc Crow, and not by SAI/Riverside management.  The decision to let some people go was consistent with Bob Hurley's practice of never guaranteeing employment to all employees during any of the 10 to 12 acquisitions he had worked for SAI.

**Marilyn Freitag** was over 40 and under a doctor's care for migraines and ulcers at the time the APA was executed.  She has never applied for disability benefits, or told anyone that she is disabled.  Her disabilities do not prevent her from performing any major life activity.  She also never heard any negative comments from SAI/Riverside personnel about people over 40,

2

and was aware that at least two people over 40 were, in fact, hired by the new entity.

Freitag believed that she began working for SAI after talking with Debbie Stuart about three weeks prior to the close of the APA. She admits, however, that she never discussed the specifics of her positions, or any type of salary, with Stuart. Freitag also admits that she never promised anyone from SAI or Riverside Toyota that she would accept employment with the new entity, and never filled out an application. On employment applications, Freitag states that she worked for Crow Brothers until SAI bought the dealership and did not retain her. Freitag had worked for dealerships in the past and had not been retained when they were bought and sold.

Freitag does not know who made the decision not to retain her, or why the decision was made. She had a reputation for being confrontational and rude. She also lacked the skills to work with the new computer system Riverside Toyota planned to implement. Stuart ultimately replaced Freitag with Joanne Herhold, who had experience with the computer system. Herhold was 70 years old and used a walker when Stuart hired her.

**Shawn P. Johnson** was 40 years old at the time the APA was executed, and believes she was terminated because of her age. Johnson believes she was hired by SAI when she was told at a group meeting that her job would be secure. She never discussed any details of her position, or accepted an offer of employment, or filled out an application with SAI or Riverside Toyota. Johnson's resume indicates that she was "not retained" by Riverside Toyota when it purchased Crow Brothers. Johnson previously worked at Jim Glover Dodge and was not retained there following a buy-out.

Johnson does not know who made the decision not to retain her, or why the decision was made. Johnson had been counseled because people smelled liquor on her breath. She was also

not experienced with the computer system Riverside Toyota planned to implement, and Debbie Stuart did not believe she had time to conduct the necessary training.  Stuart hired three new employees to handle accounts payable, car deals and titles, and payroll, which were ostensibly positions for which Johnson was being considered.  One of these new employees was 57 at the time of hiring, and another was in her sixties.

**Robert C. Lahmeyer** was over 40 at the time the APA was executed.  Lahmeyer was the General Sales Manager for Crow Brothers.  About two years prior to the APA, Lahmeyer had a stroke, which caused some problems with his memory and speech, but he still continued to work for Crow Brothers as a manager.  Lahmeyer has had two more strokes since the APA was executed, and became disabled in March 2003, after his second stroke.

Lahmeyer believes that he started working for SAI/Riverside after the health insurance meeting.  He did not discuss terms of employment or salary with anyone from SAI or Riverside, and he did not fill out a job application.

Lahmeyer agrees that a new owner has a right to select its own management team.  He understands that Marc Crow told SAI/Riverside that someone else should probably run the sales department because Lahmeyer was not meeting sales objectives.  He lacked processes on the sales floor and other management action, his follow-up with customers was poor, and the cars and lots were in disarray.  Lahmeyer has no evidence to show that the reasons given by Paul Snedic for not hiring him are untrue.

**Kevin Medlin** was in his early forties at the time the APA was executed.  He was the Assistant General Manager of Crow Brothers at the time, but he did not participate in the negotiations for the dealership.  Medlin was involved in a serious car accident during the

negotiations.  He used a wheelchair and/or walker for some time after the accident.  He is still unable to walk long distances or stand for long periods of time.  However, Medlin has never applied for disability benefits or told anyone that he is disabled.

Medlin alleges that Paul Snedic and Bob Hurley both told him that he would have a job at the new dealership.  SAI/Riverside did not have a position comparable to Assistant General Manager and, in fact, had never heard of such a position.  Furthermore, Medlin admits that he was never offered a specific position at the new dealership, and he never signed a contract with SAI/Riverside.  He does not know who decided not to retain him, or why.  He never talked to anyone from SAI or Riverside about his alleged job offer after learning he would not be retained.

Medlin agrees that management changes are likely after a dealership is acquired by a new owner.  He left a job at Turnpike Ford when a new general manager came to work there.

**David E. Pannebaker, Jr.** was the Finance & Insurance (F&I) manager at Crow Brothers at the time the APA was executed.  He had worked in the F&I department for approximately three months.  Pannebaker believes he was terminated because of his age and his heart problem, which he considers to be a disability, even though he is not limited in any major life activities and is not currently under a doctor's care.  Only one person at Crow Brothers, SAI or Riverside Toyota knew about Pannebaker's heart condition.

Pannebaker believed his position was secure after the June 2002 meeting, and after a conversation with SAI's national F&I director, Richard O'Connor.  However, he never filled out an application or discussed his salary with anyone from SAI/Riverside.

On September 19, 2002, Paul Snedic offered to retain Pannebaker as a salesman with the new dealership.  Snedic did not feel like Pannebaker could handle the load in the F&I

department.  Pannebaker said if he could not be the F&I manager, he was not going to work at the dealership.  Pannebaker admits that the decision to leave was his.  He does not list SAI or Riverside Toyota as a previous employer on his resume or job applications.  Pannebaker had a similar experience at another dealership when a new owner chose not to hire any of the existing employees.

**Glen Riley** was 56 years old at the time the APA was executed.  He used crutches because of a bad hip, and also had to have someone else appraise compact cars because of a bad back, but never applied for disability benefits or told anyone he was disabled.  Riley had hip replacement surgery in October 2002, which alleviated his hip and back problems.

Riley admits that sales people and managers move frequently from dealership to dealership.  In fact, he was employed by Crow Brothers four times.  Most recently, he was hired by Robert Lahmeyer as a sales manager, which position he held until the APA was executed.  Riley was never directly offered employment by SAI/Riverside, and he never filled out an application.  In fact, SAI/Riverside did not retain any Crow Brothers sales managers.

### <u>Discussion</u>

This Court previously ordered Plaintiffs' Response to Defendant's Motion for Summary Judgment stricken, because said Response was neither timely nor complete.  Under Fed. R. Civ. P. 56(e), "[i]f the adverse party does not [properly] respond, summary judgment, if appropriate, shall be entered against the adverse party."  *See also* LCvR56.1 (stating that all material facts set forth in the motion for summary judgment shall be deemed admitted unless specifically controverted).  Accordingly, the Court considers Defendant's Motion for Summary Judgment to be unopposed.

The Tenth Circuit has held, however, that "a party's failure to file a response to a summary judgment motion is not, by itself, a sufficient basis on which to enter judgment against the party. The district court must make the additional determination that judgment for the moving party is 'appropriate' under Rule 56." Reed v. Bennett, 312 F.3d 1190, 1195 (10th Cir. 2002). Summary judgment is "appropriate" when the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In making the summary judgment determination, the Court examines the factual record and draws reasonable inferences therefrom in the light most favorable to the non-moving party. Simms v. Oklahoma, 165 F.3d 1321, 1326 (10th Cir. 1999). The presence of a genuine issue of material fact defeats the motion. An issue is "genuine" if the evidence is significantly probative or more than merely colorable such that a jury could reasonably return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if proof thereof might affect the outcome of the lawsuit as assessed from the controlling substantive law. Id. at 249.

Again, under LCvR56.1, all material facts set forth in the motion for summary judgment are deemed admitted unless specifically controverted. Because the Court considers Defendant's Motion to be unopposed, the Court finds that there are no genuine issues of material fact and turns to the relevant law.

## I.   SAI is not a proper defendant in this action.

Sonic Automotive, Inc. has asserted since its original Answer to Plaintiffs' claims that it is not a proper defendant. SAI is the parent corporation of Riverside Toyota, but did not control

the Riverside's day-to-day employment decisions during this buy-out.  Instead, final employment decisions were made by Riverside Toyota employees Paul Snedic and Debbie Stuart.  Under the law set forth in <u>Lockard v. Pizza Hut</u>, 162 F.3d 1062 (10th Cir. 1998), SAI cannot have liability for Plaintiffs' claims.

## II.   Plaintiffs were never employed by SAI/Riverside and thus, never terminated.

The APA between SAI and Crow Brothers was executed on September 19, 2002.  On that same day, Marc Crow advised Plaintiffs that they would not be retained as employees of the new entity, Riverside Toyota.  Plaintiffs all believe, however, that they worked for SAI/Riverside in some capacity prior to September 19, 2002, based on representations made at various meetings or in individual conversations.

"In determining whether a plaintiff has demonstrated an employee-employer relationship for purposes of federal anti-discrimination legislation, courts have generally applied either the economic realities test or the hybrid test."  <u>Lambertsen v. Utah Dept. of Corr.</u>, 79 F.3d 1024, 1028 (10th Cir. 1996).  The economic realities test best serves to distinguish between employees and independent contractors, and focuses on whether the individual is, as a matter of economic fact, in business for himself.  <u>Oestman v. Nat'l Farmers Union Ins. Co.</u>, 958 F.2d 303, 305 (10th Cir. 1992).  Under the hybrid test, the Court evaluates the employer's right to control the "means and manner" of the worker's performance.  <u>Lambertson</u>, 79 F.3d at 1028.  In so doing, the Court may consider:

> (1)    the kind of occupation at issue, with reference to whether the work usually
>        is done under the direction of a supervisor or is done by a specialist
>        without supervision;
> (2)    the skill required in the particular occupation;
> (3)    who furnishes the equipment used and the place of work;
> (4)    the length of time the individual has worked;

8

(5)     the method of payment, whether by time or by job;
(6)     the manner in which the work relationship is terminated;
(7)     whether annual leave is afforded;
(8)     whether the work is an integral part of the business of the employer;
(9)     whether the worker accumulates retirement benefits;
(10)    whether the employer pays social security taxes; and
(11)    the intention of the parties.

Id.  The Court may also employ the single employer test to determine whether two entities are so intertwined that they must be considered a single employer.  Id.  Under the single employer test, the Court considers (1) interrelated operations, (2) common management, (3) centralized control of labor relations, and (4) common ownership, with centralized control over labor relations being the most important factor.  Id. at 1029.  In order to determine which of two entities was Plaintiffs' employer here, the Court may appropriately use either the hybrid test or the single employer test.  *See, e.g.,* Sivoza v. Nat'l Inst. of Standards & Tech., 282 F.3d 1320 (10th Cir. 2002) (using the hybrid test); Bristol v. Bd. of County Comm'rs of the County of Clear Creek, 312 F.3d 1213 (10th Cir. 2002) (using the single employer test).  In fact, under either test, Plaintiffs' belief that they worked for SAI/Riverside lacks merit.

First, the Court notes that the APA was not executed until September 19, 2002.  Thus, until that date, Crow Brothers still owned and operated the dealership.  Riverside Toyota did not provide any equipment, processes, or direct supervision to the dealership until after that date. Moreover, Marc Crow informed Plaintiffs that they would not be retained to work for the new entity, largely because Riverside Toyota was not their employer and did not exercise control over them.

Second, the Court notes that many if not all of the Plaintiffs were not retained because they lacked the necessary experience to conform to Riverside Toyota's processes.  For example,

the computer system used by Riverside Toyota was not "an integral part" of Crow Brothers' business.  Riverside did not purchase Crow Brothers' books, and intended to keep their own records after executing the APA; thus, operations were clearly not "interrelated."

Third, it is obvious that Crow Brothers and Riverside Toyota did not have "common management."  Rather, when the APA was executed, Crow Brothers' managers were ousted, and Riverside's management replaced them.  Marc Crow, in one of his last acts for Crow Brothers, informed Plaintiffs that they would not be retained by Riverside Toyota.  Thus, managerial control over Crow Brothers' employees was carefully delineated between the two entities.

Finally, the intent of the parties – including Plaintiffs – clearly evidences that Plaintiffs were employees of Crow Brothers, and not Riverside Toyota.  None of the Plaintiffs lists Riverside as a previous employer on their resumes.  Plaintiffs did fill out benefit applications, so that **if** they were hired by Riverside Toyota, they would not suffer any lapses in coverage.  Also, pursuant to the terms of the APA, Riverside paid all of Crow Brothers' employees' COBRA benefits and issued their 2002 W-2 forms.  These actions, however, were merely courtesies and/or contractual obligations on Riverside's part, and did not imply any control over the "means and manner" of Plaintiffs' employment.  *See, e.g.,* Sizova, 282 F.3d at 1329 (holding that payment by one entity was not dispositive in light of high level of supervision and control over day-to-day activities exerted by another entity).  Instead, Crow Brothers directed Plaintiffs' employment until the day the APA was executed.  At that time, Crow Brothers ceased to exist, and Plaintiffs' employment was terminated.  Because SAI/Riverside never employed Plaintiffs, SAI/Riverside cannot be liable for wrongful termination.

### III.   Plaintiffs' claims under the ADEA must fail as a matter of law.

**A.   Freitag and Johnson cannot establish prima facie cases under the ADEA.**

In order to establish a prima facie case of age discrimination, a plaintiff must show that she was (1) within the protected age group, (2) doing satisfactory work, (3) discharged, and (4) replaced by a person outside the protected age group.  Branson v. Price River Coal Co., 853 F.2d 768, 770 (10th Cir. 1988).   Freitag and Johnson were replaced by employees who were older than they were.  In Green v. Safeway Stores, Inc., 98 F.3d 554 (10th Cir. 1996), the Tenth Circuit noted that a plaintiff must ordinarily prove that she was replaced by a younger person.  Id. at 559.  Further, an age difference of less than ten years is considered insufficient to show discrimination.  See Hartly v. Wisc. Bell, Inc., 124 F.3d 887, 893 (7th Cir. 1997).  Here, subsequent employees Herhold, Richardson, Williams, and Moyer are all in the protected age group.  Given these circumstances, Freitag and Johnson clearly cannot satisfy their burden under the ADEA.  When the party who bears the burden of proof at trial fails to make a sufficient showing to establish the existence of each and every essential element of its claim, summary judgment is appropriate.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

**B.   Defendant had legitimate, non-discriminatory reasons for its actions.**

Assuming *arguendo* that Plaintiffs have established *prima facie* cases of age discrimination, the burden then shifts to the defendant to identify a legitimate, nondiscriminatory reason for the challenged action.  McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973) The plaintiff must then show that the proffered reason is merely a pretext for discrimination.  Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981).  The plaintiff always retains the ultimate burden of proving that he was the victim of intentional discrimination.  Id.; *see also* Selenke v. Med. Imaging of Colo., 248 F.3d 1249, 1259 (10th Cir. 2001).

11

Here, even if Freitag and Johnson had established prima facie cases of age discrimination, Defendant can show legitimate, non-discriminatory reasons for its actions, such that "the presumption of discrimination . . . simply drops out of the picture." Ingels v. Thiokol Corp., 42 F.3d 616, 621 (10th Cir. 1994) (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510-11 (1993)). Specifically, Defendant noted that Freitag was hard to get along with, and lacked the computer skills necessary to implement new processes. Johnson also lacked the requisite computer experience. Thus, these Plaintiffs' ADEA claims simply have no merit, and Defendant is entitled to judgment as a matter of law.

Defendant also had legitimate, non-discriminatory reasons for its actions toward the other Plaintiffs.[1]  Defendant noted that Pannebaker did not have enough experience to serve as F&I Director, and Pannebaker declined an offer for a different position.[2]  Further, Defendant decided not to hire any of the sales managers from the existing Crow Brothers regime. Lahmeyer was not meeting sales objectives. He lacked processes on the sales floor and other management action, follow-up with customers was poor, and the cars and lots were in disarray. Riley was hired by Lahmeyer, and had similar performance issues. Defendant did not place Lahmeyer, Riley or Medlin in different (i.e., non-managerial) positions at Riverside Toyota to avoid any resulting animosity. Instead, the new owners of the dealership chose to hire employees who would successfully implement their processes.

The Court notes that it may not second-guess the appropriateness of an employer's

_____

[1]Defendant does not argue that Lahmeyer, Medlin, Pannebaker and Riley cannot establish a *prima facie* case of age discrimination; the Court therefore assumes that they have done so.

[2]The Court finds the fact that Pannebaker was offered another position to weigh strongly against his claims of discrimination.

business decisions unless competent evidence of impermissible motives exists.  *See* Furr v.

Seagate Tech., 82 F.3d 980, 986 (10th Cir. 1996).  Plaintiffs here have presented no such

evidence.  They have not established that Defendant's proffered reasons for its actions are

"unworthy of credence" or otherwise riddled with "weaknesses, implausibilities, inconsistencies,

incoherencies or contradictions."  *See* Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997)

(setting forth standard for determining pretext).  Indeed, the Court notes that Plaintiffs

themselves acknowledged that when new owners purchase dealerships, the employees of the

previous owner are not always hired.  Plaintiffs Freitag, Johnson, Medlin, and Pannebaker all

experienced previous buy-outs in which they were not retained.  The Court therefore finds

Plaintiffs' claims of discrimination to be without merit.

### IV.   Freitag, Lahmeyer, Medlin, Pannebaker and Riley cannot establish prima facie cases under the ADA.[3]

The ADA prohibits employers from discriminating against individuals because of a

disability in regard to job application procedures, hiring, advancement, or termination,

compensation, training, or other terms and conditions of employment.  42 U.S.C. § 12112(a).

Claims alleging violation of the ADA are governed by the framework set forth in McDonnell

Douglas Corp. and Burdine, under the analysis discussed *supra* in reference to Plaintiffs' ADEA

claims.  Specifically, because Plaintiffs were employed by Crow Brothers, and were simply not

retained when Riverside Toyota assumed control of the dealership, Plaintiffs' allegations should

be analyzed as a failure-to-hire claim under the ADA.  In order to establish a *prima facie* case for

failure to hire, Plaintiffs must show that (1) they were disabled persons withing the meaning of

---

[3]Johnson did not assert an ADA claim.

the ADA; (2) they applied for and were able to perform the essential functions of the job with or without reasonable accommodation; (3) they were rejected for the position, despite being qualified; and (4) the position remained open and Defendant continued to seek applicants. Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1226 (10th Cir. 2000).

### A.   Plaintiffs are not "disabled" under the ADA.

The ADA defines "disability" with respect to an individual as (1) a physical or mental impairment that substantially limits one or more of the individual's major life activities; (2) a record of such impairment; or (3) being regarded as having such impairment.  42 U.S.C. §12102(2)(A)-(C).  Whether the plaintiff has an "impairment" within the meaning of the ADA and whether the affected conduct is a "major life activity" as contemplated by the ADA are questions of law.  Doebele v. Sprint/United Mgmt. Co., 342 F.3d 1117, 1129 (10th Cir. 2003). Whether the impairment "substantially limits" the major life activity is a question of fact, but the Court may make the determination on a motion for summary judgment.  Id. at 1129, 1130 n.5.

The Court first notes that none of the Plaintiffs had applied for disability benefits at the time the APA was executed.  They had never told anyone that they were disabled, and they do not allege that anyone at Crow Brothers regarded them as disabled.  Although SAI/Riverside personnel may have discussed Plaintiffs' health with them at some point, thereby giving rise to Plaintiffs' claims, no employment decisions were based on these conversations.  Indeed, these conversations were not held with anyone from SAI/Riverside with hiring authority.   Even to the extent that Plaintiffs claim that SAI/Riverside "regarded" them as disabled, they do not show that anyone treated them as having a substantially limiting impairment.  See MacDonald v. Delta Air Lines, Inc., 94 F.3d 1437, 1444 (10th Cir. 1996).  Rather, Plaintiffs' ADA claims rest

14

primarily upon speculation and conjecture, which will not suffice to overcome summary judgment.  *See* Giordano v. City of New York, 274 F.3d 740, 749 (2d Cir. 2001).

The Court also notes that all of the Plaintiffs seem to rely primarily upon the fact that all of the people who were not retained by SAI/Riverside were over 40 and/or disabled.  Of course, mere "[a]llegations do not rise to an issue of material fact."  Herring v. Canada Life Assur. Co., 207 F.3d 1026, 1030 (8th Cir. 2000).  Moreover, upon examination of each Plaintiff's case, the Court still finds no evidence of a colorable ADA claim.  *See* Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 198 (2002) (requiring ADA plaintiffs to offer evidence "that the extent of the limitation [caused by their impairment] **in terms of their own experience** is substantial") (emphasis added); Sutton v. United Air Lines, Inc., 527 U.S. 471, 483 (1999) (noting that case-by-case analysis is required in ADA cases because an impairment which disables some individuals may not disable others).

**Freitag** contends that she is disabled because she is under a doctor's care for migraine headaches and ulcers.  However, "[t]he determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual."  Toyota Motor Mfg., 534 U.S. at 198. Here, Freitag admits that her own impairments do not prevent her from holding a job, or inhibit any major life activities.

**Lahmeyer** had a stroke about two years before the APA was executed.  Although he had some difficulty with his speech and memory following the stroke, he did not consider himself to be disabled at that time, and continued to work in a managerial capacity for Crow Brothers. Although Lahmeyer never had any discussions with Paul Snedic, he did talk with Bob Hurley.

15

Hurley specifically denies knowing about Lahmeyer's stroke, or noticing any overt disability. Lahmeyer has not offered any evidence to show that SAI/Riverside perceived him as being disabled.  Further, Lahmeyer does not show that he was substantially limited in any major life activity at the time the APA was executed, although he has considered himself to be disabled since March 2003, when he suffered a second stroke.

**Medlin** used a wheelchair and/or walker at the time the APA was executed, due to a serious car accident.  Paul Snedic and Bob Hurley both inquired about his injuries, which Medlin admits is not uncommon in this situation.  Medlin further admits that his use of the wheelchair and/or walker was temporary, until his cast was removed.  Although Medlin claims that, in 2004, a third party told him that Steve Harbor of SAI referred to him as "the guy in the wheelchair," such hearsay statement is insufficient to show that the hiring authorities for Riverside Toyota regarded him as disabled.

Medlin now asserts that he is unable to walk long distances or stand for long periods of time since his car accident.  After the accident, however, he continued to work for Crow Brothers with certain accommodations, and has been employed at Superwrench as a service advisor since his unemployment benefits ended six months after his discharge from Crow Brothers.  Clearly, Medlin's impairments do not substantially limit his ability to work. Moreover, courts have specifically held that "moderate restrictions on the ability to walk do not amount to a substantial limitation."  McCoy v. USF Dugan, Inc., 42 Fed. Appx. 295, 297 (10th Cir. 2002) (citing "Talk v. Delta Airlines, Inc., 165 F.3d 1021, 1025 (5th Cir. 1999) (limping, 'moving at a significantly slower pace than the average person,' and difficulty walking in extreme cold do not constitute a substantial impairment); Penny v. United Parcel Serv., 128 F.3d

16

408, 415 (6th Cir. 1997) ('moderate difficulty or pain experienced while walking does not rise to

the level of a disability'); <u>Kelly v. Drexel Univ.</u>, 94 F.3d 102, 106 (3d Cir. 1996) (inability to

walk 'more than a mile or so,' to jog, and need to go slowly up stairs does not constitute

substantial limitation in walking); 29 C.F.R. pt. 1630, app. § 1630.2(j) (walking is substantially

limited if individual 'can only walk for very brief periods of time')").

　　　　**Pannebaker** contends that a heart attack in December 2001 caused him to be disabled.

He admits, however, that the heart attack was relatively minor and that he is no longer under a

doctor's care for his heart condition.  He further admits that his heart condition has never

prevented him from working, or substantially limited him in any major life activity.

　　　　**Riley** alleges that his bad back renders him disabled.  He notes that he needs someone

else to appraise compact cars because he has difficulty getting in and out of smaller models.

This difficulty, however, does not pose a substantial limitation.  *See* <u>Mackenzie v. City &</u>

<u>County of Denver</u>, 414 F.3d 1266, 1276 (10th Cir. 2005) (noting that, when working is identified

as a major life activity, plaintiff must demonstrate inability "to perform either a class of jobs or a

broad range of jobs in various classes").  Riley also notes that he was having difficulty with his

hip around the time the APA was being negotiated, and had hip replacement surgery on October

1, 2002.  Because a disability exists "only where an impairment substantially limits a major life

activity, not where it might, could, or would be substantially limiting if mitigating measures

were not taken," Riley's hip problems also do not render him disabled under the ADA.  *See*

<u>Sutton</u>, 527 U.S. at 482.  Riley was able to work prior to the surgery, sometimes without

accommodation and sometimes using crutches.  Since the surgery, both his hip and back

problems have been alleviated.

The standard for declaring a plaintiff "disabled" is demanding, <u>Toyota Motor Mfg.</u>, 534 U.S. at 197.  The Court finds here that Plaintiffs have not proved that the limitations caused by their impairments are substantial "in terms of their own experience," nor have they proved that Riverside Toyota regarded them as being substantially limited.  Because Plaintiffs have failed to establish a *prima facie* case under the ADA, summary judgment in favor of Defendant is appropriate.  <u>Celotex Corp.</u>, 477 U.S. at 322.

### B.   Defendant had legitimate, non-discriminatory reasons for its actions.

Even if these Plaintiffs had established *prima facie* cases under the ADA, Defendant can show legitimate, non-discriminatory reasons for its actions, such that summary judgment in Defendant's favor is appropriate.  *See supra* section III (discussing said reasons).

### V.  Plaintiffs' claims under Oklahoma law are also without merit.

Plaintiffs claims under the OADA fail for the same reasons their federal ADEA and ADA claims fail.  *See* <u>Saint v. Data Exch., Inc.</u>, 2006 OK 59, ___ P.3d ___ (recognizing a state law tort remedy for those who allege age discrimination).  *But see* <u>Clinton v. State ex rel. Logan County Election Bd.</u>, 29 P.3d 543, 546 (Okla. 2001) (holding that "when an employer discharges a terminable-at-will employee based on the employee's status and the reason for the discharge violates Oklahoma's clear and compelling public policy, but the employee has an adequate federal statutory remedy for the wrongful discharge," that employee may **not** also bring a state law tort claim).  The Court further notes that Defendant's actions were taken pursuant to legitimate, non-discriminatory, business reasons, and therefore did not violate Oklahoma public policy in any event.

### VI.   Plaintiffs' breach of contract claims must fail as a matter of law.

A contract must be based upon a mutual agreement of both parties, which agreement is communicated by each party to the other. 15 Okla. Stat. § 51.  "Before an offer can become a binding promise and result in a contract, it must be accepted, either by word or act, for without this, there cannot be an agreement.  Nor is a promise binding on its maker unless the promisee has assented to it."  Sosbee v. Clark, 207 P. 732, 733 (Okla. 1922).  Plaintiffs here cannot present evidence sufficient to establish the basic elements of a contract, and Defendant is therefore entitled to summary judgment.

Plaintiffs allege that SAI/Riverside assured them that their jobs were secure, which Plaintiffs interpreted as a contract for employment.  However, Plaintiffs agree that no direct offers of employment were made to them, and that they never formally accepted offers of employment.  Plaintiffs also agree that they never discussed salary with anyone from SAI or Riverside Toyota.  A contract is not complete until the essential parts of the agreement have been established.  Griffin Grocery Co. v. Kingfisher Mill & Elevator Co., 32 P.2d 63, 66 (Okla. 1934).  An employee's salary would surely be an "essential part" of an employment contract.  Further, a contract is not effective unless and until negotiations have ended and a "meeting of the minds" is evidenced.  Sosbee, 207 P. at 734.  In other words, pursuant to both Griffin Grocery and Sosbee, without terms, there can be no contract.

Indeed, Johnson, Riley and Lahmeyer never met individually with anyone from SAI or Riverside Toyota to discuss any issue involving the APA.  They "assumed" that they would continue with Riverside Toyota in the same positions they held with Crow Brothers, but never expressly agreed to any specific position, terms of employment, job description, or salary.

Freitag contends that Debbie Stuart, the incoming controller for Riverside Toyota,

19

offered her the position of Human Resources Director for the new dealership.  She admits, however, that no terms were discussed.  Moreover, Freitag never contacted Stuart to question her about this alleged offer after Marc Crow informed Freitag that she was not being retained by Riverside.

Similarly, Pannebaker alleges that Richard O'Connor, SAI's national F&I director, told him that he would have an opportunity to "prove himself" under SAI's financial guidelines. Again, however, this conversation does not evidence a "meeting of the minds" or the formation of a contract.  Moreover, it is undisputed that Paul Snedic, who ultimately made hiring decisions for Riverside Toyota, believed that Pannebaker was not qualified to continue in the position of F&I director for Riverside.  Instead, Snedic offered Pannebaker another position, which Pannebaker refused.

Medlin alleges that Paul Snedic and Bob Hurley assured him that he would have a job in some capacity with Riverside Toyota.  He agrees, however, that he was never offered a specific position at the new dealership.  He also never contacted Snedic or Hurley to question them about his alleged job offer after Marc Crow advised Medlin that he was not being retained by Riverside.

For the foregoing reasons, the Court finds that no oral contract for employment was formed between Plaintiffs and Defendant, and thus, no breach of contract occurred.  Defendants are therefore entitled to summary judgment on Plaintiffs' breach of contract claims.

**Conclusion**

For all the foregoing reasons, the Court finds that Defendant is entitled to judgment as a matter of law on all of Plaintiffs' claims.  Defendant's Motion for Summary Judgment is therefore GRANTED in its entirety, and Plaintiffs' claims are DISMISSED.

IT IS SO ORDERED this 22nd day of August 2006.

James H. Payne
United States District Judge
Northern District of Oklahoma